No. 57,581

CONSOLIDATED BEEF INDUSTRIES, INC., and HURON DRESSED BEEF, INC., *Appellees,* v. JAMES C. SCHUYLER and HAROLD AUDSLEY, *Appellants.*

(716 P.2d 544)

Opinion filed March 28, 1986.

*Richard D. Simpson,* of Morris, Larson, King, Stamper and Bold, of Overland Park, and *Thomas H. Davis,* of the same firm, of Kansas City, Missouri, were on the briefs for appellant James C. Schuyler.

*Charles D. Sauer,* of Overland Park, was on the brief for appellant Harold Audsley.

*Kristen G. Stroehmann,* of Barnett & Ross, Chartered, of Kansas City, and *Bernard J. Rhodes,* of Gage & Tucker, of Kansas City, Missouri, were on the brief for appellees.

The opinion of the court was delivered by

PRAGER, J.: This is an action brought by corporate creditors of a bankrupt corporation to recover from two officers and owners of the corporation certain sums admittedly due and owing to the plaintiffs for the sale of beef products to the bankrupt corporation. The plaintiffs also sought to recover compensatory and

punitive damages for fraud from the two individual defendants. The plaintiffs are Consolidated Beef Industries, Inc., (Consolidated Beef) and its allied corporation Huron Dressed Beef, Inc. (Huron). For a number of years, Consolidated Beef and Huron have been in the business of purchasing cattle carcasses, separating the meat from the bone, and selling both by-products to other companies. Consolidated Beef, through its subsidiary Huron, had sold cattle carcasses to the Midwest Boneless Meat Co., Inc., (Midwest Boneless) for processing and resale to other companies.

A line of credit had been established in favor of Midwest Boneless by Consolidated Beef. In the summer of 1982, the idea was conceived by the individual defendants, James C. Schuyler and Harold Audsley, to form a new company, 601 Investors, Inc., in order to acquire Midwest Boneless Meat Company. On June 2, 1982, 601 Investors, Inc., was organized under Missouri law with three stockholders. Schuyler owned 80% of the stock and two men, Harvey and Hart, each owned a 10% interest. These three men were each directors and officers. Defendant Schuyler was president of 601 Investors, Inc., which took over operation of Midwest Boneless in August of 1982. Thereafter, Consolidated Beef and its allied corporation, Huron, continued to sell beef carcasses to Midwest Boneless. Subsequent thereto, problems arose regarding the payment of accounts owed by Midwest Boneless and 601 Investors, Inc., to Consolidated Beef.

In September of 1982, the corporate credit manager for Consolidated Beef requested Schuyler to provide a personal financial statement so that the line of credit for Midwest Boneless could be continued. At Consolidated Beef's request, Schuyler provided a financial statement and also a guaranty and indemnity agreement to pay the debts and obligations owed by Midwest Boneless to Consolidated Beef and Huron. Thereafter, a larger line of credit was established which was increased from time to time. In September of 1983, the credit manager for Consolidated Beef requested a second personal financial statement from Schuyler, which Schuyler completed and forwarded. On November 1, 1983, the corporate charter for 601 Investors, Inc., was forfeited. Thereafter, during the month of November 1983, $437,626 worth of beef was shipped by Consolidated Beef to Midwest Boneless. Midwest Boneless never paid the amount of

those invoices, because Midwest Boneless and 601 Investors, Inc., took bankruptcy.

Consolidated Beef and Huron then brought this action to recover the amount of the corporate debt from the defendants, James C. Schuyler and Harold Audsley, personally on the basis that both of them were statutory trustees of the defunct corporation, 601 Investors, Inc., under Missouri law and obligated to pay the debts of the corporation incurred in November of 1983, and also from Schuyler on the basis of his personal guaranty and indemnity agreement. Plaintiffs also asserted claims against each of the individual defendants based on fraudulent misrepresentations. The case was tried to a jury. At the close of the plaintiffs' evidence, the district court granted plaintiffs' motion for directed verdict against both of the defendants, Schuyler and Audsley, in the amount of the unpaid invoice value of the beef which was shipped and delivered to Midwest Boneless during November of 1983. As a part of the plaintiffs' case, both Schuyler and Audsley were called to testify as witnesses for the plaintiffs. The trial court granted plaintiffs' motion for directed verdict against both of the defendants based upon their liability as corporate trustees and also against Schuyler because of his personal guaranty to pay the debts of Midwest Boneless. On the claim of fraudulent misrepresentation as to defendant Audsley, the trial court directed a verdict in Audsley's favor. On the claim of fraudulent misrepresentation as against defendant Schuyler, the trial court permitted the case to go to the jury which brought in a verdict for punitive damages in the amount of $650,000 against Schuyler. Both Schuyler and Audsley appealed.

The first issue raised on the appeal is asserted by both Schuyler and Audsley, each contending that the trial court erred in directing a verdict of liability against him for the corporate debt of 601 Investors, Inc., on the basis that each of them was liable as a corporate trustee under Missouri law. In determining the liability of Schuyler and Audsley for the debts of Midwest Boneless and 601 Investors, Inc., the trial court correctly applied the law of Missouri, because 601 Investors was a Missouri corporation. The generally accepted rule is that a corporation's charter and the laws of its domicile govern with respect to the fact and duration of corporate existence and the rights and

liabilities of its officers, stockholders, and directors. 20 C.J.S., Corporations § 1802.

The statute of the State of Missouri which governs the forfeiture of corporate rights and the powers and liabilities of directors and officers when a forfeiture occurs is Mo. Rev. Stat. § 351.525 (1984 Supp.), which provides in part:

"351.525. **Corporate rights forfeited, when—trustees—powers.**

"If any corporation:

"(1) Fails to comply with the provisions of this chapter with respect to its annual registration (but not the 'first registration' required in section 351.120), or fails to file its annual franchise tax report and pay its franchise tax due under the provisions of chapter 147, RSMo, within ninety days after the time therein required (determined with regard to any extension of time for filing its franchise tax report or for the payment of its franchise tax);

. . . .

"The corporate rights and privileges of the corporation shall be forfeited, and the secretary of state shall thereupon cancel the certificate, or license, of the corporation by appropriate entry on the margin of the record thereof, whereupon all the powers, privileges and franchises conferred upon the corporation by the certificate, or license, shall, subject to rescission as provided in this chapter, cease and determine; and the secretary of state shall notify the corporation by mail, addressed to its registered office, as disclosed by the records of his office, that its corporate existence and rights in this state have been forfeited and canceled, and the corporation dissolved subject to rescission as provided in this chapter; *and the directors and officers in office when the forfeiture occurs shall be the trustees of the corporation, who shall have full authority to wind up its business and affairs, sell and liquidate its property and assets, pay its debts and obligations and to distribute the net assets among the shareholders;* and the trustees as such shall have power to sue for and recover the debts and property due the corporation, describing it by its corporate name, and may be sued as such; *and the trustees shall be jointly and severally responsible to the creditors and shareholders of the corporation to the extent of its property and effects that shall have come into their hands.*" (Emphasis supplied.)

The Missouri cases hold that the statutory trustees of a defunct corporation are the officers and directors in office when the forfeiture occurs. *Mitchell v. Director of Revenue,* 619 S.W.2d 352 (Mo. App. 1981).

In *State ex rel. Jay Bee Stores, Inc. v. Edwards,* 636 S.W. 2d 61 (Mo. 1982), the Supreme Court of Missouri held that the statutory trustees of a defunct corporation have no authority to transact new business in the name of the corporation after the corporation's demise and are jointly and severally liable for any obligations they so incur. They are not to conduct any affairs except to wind up corporate affairs and distribute its assets, if any exist. If, however, officers, as trustees, engage in new business in

the name of the corporation after the corporation has forfeited its charter, they are jointly and severally liable for any new obligations they so incur. *Leibson v. Henry,* 356 Mo. 953, 962, 204 S.W.2d 310 (1947).

In the case now before us, the evidence was undisputed that the Missouri corporation, 601 Investors, Inc., forfeited its charter on November 1, 1983, for failure to pay the state franchise tax. Notice of the forfeiture was sent to the registered agent. The evidence was undisputed that the defunct corporation continued to operate its normal business during the month of November 1983. Under Missouri law, the officers and directors of 601 Investors, Inc., are personally liable for debts incurred involving new business conducted on behalf of the corporation. The issue then arises whether there was sufficient evidence to show that the defendants, Schuyler and Audsley, were officers or directors of the corporation in November of 1983. Defendant Schuyler admitted that he was an officer and director of 601 Investors, Inc., since he acted as president of the company. He was clearly liable individually for the corporate debt.

There was undisputed evidence presented in the case that Audsley prepared income tax returns for 601 Investors, Inc., and signed the same as secretary both before and after the forfeiture of the corporate charter on November 1, 1983. Under the Internal Revenue Code, a corporate income tax return and all related documents requiring a signature on behalf of the corporation must be signed by either the president, vice-president, treasurer, assistant treasurer, chief accounting officer (controller) or any other officer duly authorized to sign. Where a return is made for the corporation by a trustee, receiver or assignee, such fiduciary must sign. (Internal Revenue Code, 26 U.S.C.A. § 6062 [1980].) Where an individual's name is signed on a corporate return, it will be presumed that the individual was authorized to sign on behalf of the corporation. The trial court held that Audsley was acting as an officer and was, therefore, liable for the corporate debt, because he signed the corporate income tax forms as secretary of the corporation. It is clear from the evidence that Schuyler and Audsley were acting as the operators and officers of the corporation in November 1983 when its corporate charter was forfeited. We have concluded that the trial court did not err in holding that both of the defendants, Schuyler and Audsley,

were individually liable for the corporate debt as corporate trustees under the Missouri statutes and court decisions set forth heretofore in the opinion.

Defendant Schuyler's second point on the appeal is that the trial court erred in directing a verdict of liability against him on the basis that he, Schuyler, personally guaranteed payment of the debts and obligations of the bankrupt corporation. The evidence is undisputed that on October 22, 1982, James C. Schuyler signed and delivered a guaranty and indemnity agreement in which he unconditionally guaranteed to Huron Dressed Beef, Inc., and Consolidated Beef Industries, Inc., as obligees, the full and prompt payments by the obligor (Midwest Boneless) of all obligations which the obligor presently or hereafter may have to the obligees and the payment of all sums hereafter owing from the obligor to the obligees.

Defendant Schuyler argues that he is not personally liable because he signed the personal guaranty agreement using the name of "James C. Schuyler, President." It is his position that because he signed the guaranty agreement as "President," he cannot be held personally and individually liable for the corporate debt. We find no merit to this contention. The identical issue was before the United States Court of Appeals for the Tenth Circuit in *Ricker v. B-W Acceptance Corporation,* 349 F.2d 892 (10th Cir. 1965). In *Ricker,* the trial court had granted summary judgment against defendant Ricker, who had signed a personal guaranty as president of the corporation. The *Ricker* court ruled that the company president's position that he did not intend to obligate himself personally raised no material issue of fact, because the written guaranty agreement was not ambiguous. The court held that to construe the written guaranty as binding only the corporation and not Ricker, individually, would contradict and vary the language of the written agreement itself.

The same holding is required under the facts in this case. In the guaranty and indemnity agreement, Schuyler, as guarantor, unconditionally guaranteed to the obligees to pay all sums presently and hereafter owed by the obligor to the obligees. We note also that the fifth paragraph of the guaranty agreement provided that the obligations of the undersigned (guarantors) shall be binding upon their respective heirs and personal representatives. Such a provision would not have been included unless

Schuyler intended that he be personally bound to pay any debt owed by Midwest Boneless to Huron Beef Processors and Consolidated Beef Industries. We hold that the trial court was correct in directing a verdict against defendant Schuyler, holding him personally liable for the debt of Midwest Boneless on the basis that he had personally guaranteed the corporate debt owed to the plaintiffs.

The next point raised by defendant Schuyler on the appeal is that the trial court erred in admitting certain evidence before the jury on the issue of the defendants' fraudulent misrepresentations. We have considered the entire record in this case and concluded that the trial court did not commit error. The admission of the evidence in regard to the book "The Fountain Pen Conspiracy" and evidence of Schuyler's prior actions in diverting corporate funds, which had the effect of milking the financial assets of Midwest Boneless, were admissible to show Schuyler's fraudulent intent. We find no error in these rulings.

The last issue raised by Schuyler on the appeal is that the jury verdict finding him guilty of fraud was not supported by clear and convincing evidence. We hold this point to be without merit. The evidence was undisputed that Schuyler furnished to the comptroller of Consolidated Beef a personal financial statement in September 1982, and a second financial statement in September of 1983, about one year later. The evidence was undisputed that information was contained in both financial statements which was contrary to the true facts. In these two financial statements, Schuyler showed a net worth in excess of $1,600,000. The largest stated asset in both statements was 523 acres of land in DeKalb, Missouri, which he valued at $1,046,000. In reality, Schuyler and his wife jointly owned a one-half interest in 120 acres of land in DeKalb. Mrs. Schuyler also held a life estate in 80 acres. These facts were in conflict with Schuyler's representation that he owned an outright interest in 520 acres.

Schuyler claimed a stock interest in J. C. Schuyler Enterprises, Inc., in the amount of $90,000. At the time the statements were delivered, the company either was already out of business or went out of business in a matter of weeks. Schuyler claimed $54,000 as the value of his interest in Automatic Vending. This company had been dissolved more than ten years earlier. There were other similar misrepresentations of assets in the financial

statements. Because of these two incorrect and untrue financial statements, and Schuyler's personal guaranty, the plaintiffs continued to ship beef to Midwest Boneless. As a result, when Audsley and Schuyler shut down Midwest Boneless Meat Company in November of 1983, the plaintiffs had shipped over $437,626 worth of carcass beef which was never paid for. The evidence indicated that defendant Schuyler intentionally misrepresented his financial worth for the purpose of inducing plaintiffs to extend credit. We find that the jury's verdict finding defendant Schuyler guilty of fraudulent misrepresentation was supported by the evidence and it must be upheld.

The judgment of the district court is affirmed.